STATE OF CONNECTICUT *v.* PASQUALE DEMATTEO

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and DALY, Js.

Argued January 11—decision released April 20, 1982

*Frank Antollino,* for the appellant (defendant).

*Linda K. Lager,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Michael Dearington,* assistant state's attorney, for the appellee (state).

PARSKEY, J. The defendant was charged by indictment and information with the crimes of murder and conspiracy to commit murder. The jury returned a verdict of not guilty to the charge of murder and guilty to the charge of conspiracy to commit murder, in violation of General Statutes § 53a-48 (a).[1] The jury could have found the following facts: The victim was a sixteen-year-old state ward under the supervision of the department of children and youth services, living in West Haven with the defendant's sister, Lucille, her husband, Robert, and their children. The defendant and the victim did not like each other. The victim occasionally struck Lucille on the shoulder. At approximately 11 a.m. on May 5, 1978, Lucille left the house and went to New Haven to help her hus-

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

band start his truck. The victim remained home with Lucille's three-year-old daughter. Her older, five-year-old daughter was due home from school shortly thereafter. When Lucille returned around noon, she found her older daughter in a bedroom and the victim walking out of it buckling his pants. The victim left the house. Lucille examined her older daughter and found evidence that she had been sexually assaulted.

When Lucille told her husband about the incident that afternoon, he became angry and grabbed a gun from the kitchen but then replaced it and did not leave the house. She asked her husband not to tell the defendant about the incident. In the early evening, the defendant came over with a repairman and discussed with Robert work to be done on their driveway. At some point in the evening, the defendant and Robert had a private conversation. The defendant and the repairman then left together. On the way back to North Haven, the defendant told the repairman about the incident and declared that he was going to give the victim a beating.

Between five and ten minutes after they left, Robert told his wife that he had told the defendant about the incident. He then went to North Haven and brought the defendant back to the house. They remained there, drinking, in the kitchen. The defendant demanded to know all of the details of the incident. When the victim came in, he was invited to drink with them. When the victim initially refused, the defendant taunted him into changing his mind. He and the victim arm wrestled and the defendant grew upset because he lost most of the matches. All three left the residence together at approximately 9:40 p.m. in Robert's car.

Sometime between 10 p.m. and 11 p.m. that same evening, the defendant went into a restaurant where his uncle worked, took him aside, asked him for a shovel and said "we" or "he" "snuffed" or "wasted somebody." Thinking that the defendant was joking, his uncle replied, "Well, get it out of here and throw it in the river." The next day, the victim's body was found in the river behind the restaurant.

Robert returned home at about 2 a.m. on May 6, covered with blood. The defendant went to his sister's home between 8 a.m. and 11 a.m. that day. He told Lucille and Robert he threw the weapon in the river. He then threw some live shells into a sewer in front of their house. Lucille pointed out that their car had bullet holes and blood stains in the backseat area. It was then that the defendant described how he had shot the victim and how her husband participated in the plan. He told her to report the victim missing but not to tell the police about the incident with her older daughter.

On May 8, the defendant went to the North Haven police station to answer questions about the homicide. He claimed to have remained home that entire evening after being dropped off by the repairman.

At a meeting including the defendant and Lucille and Robert, the family arranged to remove the blood stains from the car and install a new backseat.

On February 14, 1979, the defendant told Lucille's neighbor, Rosemary, that his brother-in-law Robert had killed the victim. In her first statement to the police, Lucille implicated her husband only because

she did not want her brother to go to jail. She subsequently told them of the defendant's admission that he had killed the victim.

In this appeal, the defendant raises five issues: (1) whether the court erred in denying his motion to suppress his statements made at the police station; (2) whether the court erred in admitting a statement made by the defendant as indicating consciousness of guilt; (3) whether the court erred in denying his motion for mistrial made when Lucille testified that he had previously served time in jail; (4) whether the court erred in giving the jury charge by misstating the testimony, improperly instructing the jurors on consciousness of guilt, and failing to instruct them accurately on the elements necessary to establish the crime of conspiracy; and (5) whether the court erred in denying his motions for judgment of acquittal at the close of evidence and after the verdict on the grounds of insufficiency of evidence.

# I

## POLICE INTERROGATION

The defendant moved to suppress a signed statement he gave the police upon the conclusion of an interrogation conducted at the North Haven police headquarters. The defendant claims that this statement was procured in violation of his rights under the fifth and fourteenth amendments of the United States constitution. His specific claim is that he was subjected to custodial interrogation in the absence of the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). It is undisputed that no *Miranda* warnings were given. The state contends, however, that since the defendant was not in cus-

tody during the questioning, no *Miranda* warnings were required. *Oregon* v. *Mathiason,* 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). Since the defendant does not challenge the voluntariness of the statement, the limited question before us is whether the defendant was in custody at the time of the questioning. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* supra, 444.

The defendant's statement was given to the police under the following circumstances: On May 7, 1978, the defendant was invited to talk with the North Haven police either at the police department or his place of employment, at his choice. The defendant made an appointment to talk with the police at the stationhouse after work the next day and went there voluntarily. Once he arrived at the North Haven police department, he and Detective Stephen Smith engaged in some small talk and the detective told him the police were investigating the victim's case and looking for information about the victim's background. Either Detective Joseph DePoto, who was also present, or Smith told the defendant he was free to leave at any time. Neither detective gave the defendant *Miranda* warnings. Upon inquiry by Smith about his whereabouts on the evening of May 5 and the early morning hours of May 6 the defendant responded that he had gone to his sister's residence with the repairman and that later the repairman took him home where he remained for the remainder of the evening. He claimed that he and his brother-in-law were drinking there until 1:30 a.m. when his brother-in-law

left. After the defendant gave the police a signed statement he left the station. During the questioning the defendant was not inhibited in any way nor was he subjected to any threats. He was not arrested until nine months later. In view of these circumstances, we find that the defendant was not in custody at the time of questioning. The trial court did not err in denying his motion to suppress the statement.

## II

### STATEMENT REFLECTING CONSCIOUSNESS OF GUILT

A statement of a party is generally admissible as an admission to establish the proof of matters stated therein. *State* v. *Moynahan,* 164 Conn. 560, 576, 325 A.2d 199 (1973). A misstatement of a suspect to police officers is admissible against him in a later prosecution because it permits the jury to draw the reasonable inference that the misstatement was made in an attempt to avoid detection for the crime. *State* v. *Chin Lung,* 106 Conn. 701, 715, 139 A. 91 (1927). The fact that by showing a consciousness of guilt the evidence may be damning does not thereby render it inadmissible.

The defendant while implicitly conceding its relevance nevertheless claims that because the prejudicial effect of the evidence clearly outweighed its probative value, the statement, even if relevant, should have been excluded. There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence

offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. McCormick, Evidence (2d Ed.) § 185, pp. 439–40. None of these dangers is present here. Obviously if the defendant lied about his whereabouts on the evening in question, it is a fair inference that he had something to hide. When other evidence established that there was a strong connection between the defendant and the victim on the evening in question it could be inferred that the defendant's misstatement to the police was an attempt on his part to cover up his involvement in the homicide. What his statement revealed was interesting; what it concealed may have been devastating. Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous. Applying this standard, the court's ruling was proper.

### III

#### CRIMINAL RECORD

The defendant also claims that his right to a fair trial was destroyed when, during her testimony, Lucille stated that he had once "served time." The trial court denied the defendant's motion for mistrial, struck the testimony, and cautioned the jury to disregard the statement. The defendant claims nevertheless that these actions of the trial court could not have removed the prejudicial effect of her statement. "The general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial." *State* v. *Turcio,*

178 Conn. 116, 143, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980). Because of the trial court's broad discretion in passing on motions for mistrial and because of the immediate curative instruction given by the court, we can not conclude that the denial of the motion constituted an abuse of discretion in this case. See *State* v. *Gooch,* 186 Conn. 17, 25, 438 A.2d 867 (1982).

## IV

### JURY CHARGE

The defendant next challenges the jury charge in three respects, first, the trial court's manner of reviewing the evidence which was before the jury. Because he took no exception to the charge; Practice Book § 854; he asks that we consider the issue under the bypass rule of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), claiming a violation of his right to a fair trial in that the court unfairly summarized the testimony, invading the fact-finding province of the jury. Assuming, without deciding, a misstatement of testimony, the question before us would be whether the trial court abused its discretion; General Statutes § 54-89;[2] *State* v. *Vincenzo,* 171 Conn. 240, 243–44, 368 A.2d 219 (1976); which is not a matter of constitutional dimensions.[3] Issues determined by nonconstitu-

---

[2] "[General Statutes] Sec. 54-89. DIRECTION OF COURT TO JURY. The court shall decide all issues of law and all questions of law arising in the trial of criminal cases. In committing the cause to the jury, if in the opinion of the court the evidence is not sufficient to justify the finding of guilt beyond a reasonable doubt, the court may direct the jury to find a verdict of not guilty; otherwise the court shall submit the facts to the jury without directing how to find their verdict."

[3] Although in rare instances an abuse of discretion may implicate due process rights, this case does not require that level of consideration.

tional standards do not belong on the *Evans* bypass to this court. Because the defendant's claim fails in fact to warrant a constitutional tag, it merits no further consideration. *State* v. *Kurvin,* 186 Conn. 555, 442 A.2d 1327 (1982); *State* v. *Gooch,* supra.

The defendant's second challenge to the jury instructions involves the claimed inaccuracy of the court's summary of his statement concerning consciousness of guilt. We note that the defendant properly preserved this claim below so that this issue is not presented by him through *Evans.* The defendant's statement in response to the officer's question was that he did not leave his home during the evening in question. In reviewing the evidence the court told the jury that the defendant denied involvement in the victim's death.

It is within the trial court's discretion to call attention to certain evidence and to comment upon it. General Statutes § 54-89; *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645 (1974). The trial court's summary of the defendant's answer placed it in context with the subject matter of the officer's question about his whereabouts when the crime occurred. The court was not required to quote the defendant's statement. Its summary of the defendant's position was accurate and does not amount to an abuse of discretion.

Thirdly, the defendant argues that the trial court erred in instructing the jury on the elements of the crime of conspiracy to commit murder. After charging the jury, the court received from them a question on whether a finding of intent to do bodily harm to the victim was sufficient to support a verdict of guilty to the charge of conspiracy to commit

murder.[4] The trial court summarized the information for the jury and then answered their question in the negative. Because no exception was taken to this portion of the charge, the defendant seeks review of this issue by the *Evans* bypass principle, *State* v. *Evans,* supra, arguing that the claimed error deprived him of the right to a fair trial. The defendant claimed that the preface to the courts response of "no" misled the jury by indicating that general criminal intent is sufficient to convict on the charge of conspiracy to commit murder rather than a specific intent to commit murder.

The defendant's argument merits consideration under *Evans* because it involves an instruction upon intent, an element of the crime upon which the court had the constitutional duty to instruct the jury sufficiently; *State* v. *Kurvin,* 186 Conn. 555, 442 A.2d 1327 (1982) ; *State* v. *Maselli,* 182 Conn. 66, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981) ; and there is specific support in the record, the language quoted in footnote 4, of a potential violation of his right to a fair trial. The question before us upon review of the entire charge is whether it is reasonably possible that the jurors were misled. *State* v. *Kurvin,* supra; *State* v. *Ruiz,* 171 Conn. 264, 273, 368 A.2d 222 (1976). In view of the fact that the court was

---

[4] The jury's note asked: "If the jury finds in fact that Pasquale DeMatteo did enter into a conspiracy to do bodily harm to [the victim] but not beyond a reasonable doubt that he entered into a conspiracy to cause the death of [the victim] and that one member of the conspiracy did commit an overt act, is that finding sufficient to support a verdict of guilty to the conspiracy charge?"

The trial court responded: "The charge accused Mr. DeMatteo of acting with intent that conduct constituting a crime be performed and did agree with [his brother-in-law] and other persons known and unknown to engage in the crime of murder.

"And, the answer, therefore, to your question is no."

careful continually to tell the jury of the specific intent required and again to remind them of this requirement in response to their question, we cannot agree that it was reasonably possible that they were misled by hearing the court read to them the state's information.

## V

### SUFFICIENCY OF EVIDENCE

At the close of the evidence and after the jury's verdict, the defendant moved pursuant to Practice Book § 885 and § 899, respectively, for judgment of acquittal on the ground that the evidence presented was insufficient to support a finding of guilty beyond a reasonable doubt of the crimes charged. The defendant appeals from the denial of those motions.

"To establish the crime of conspiracy under Section 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed." *State* v. *Ortiz*, 169 Conn. 642, 645, 363 A.2d 1091 (1975). The conspiracy may be proved through circumstantial evidence. *State* v. *Hayes*, 127 Conn. 543, 554, 18 A.2d 895 (1941). On appeal, this court construes the evidence in the manner most favorable to sustaining the conviction. *State* v. *Gunning*, 183 Conn. 299, 309, 439 A.2d 339 (1981).

The state presented substantial circumstantial evidence from which the jury could have found beyond a reasonable doubt the existence of an

agreement to commit murder, an overt act in furtherance of the conspiracy, and an intention to commit murder. The testimony on the defendant's reaction to learning about the apparent sexual assault upon his niece and his threats of violence to the victim for his behavior toward Lucille supplied a motive for the crime. There was also evidence of meetings between the defendant and his brother-in-law which presented the opportunity for them to formulate the plan to kill the victim. The defendant told his sister not to tell the police about the assault on his niece or his return to her home during the evening in question.

The circumstances under which the victim became intoxicated indicate that the defendant and his brother-in-law intended to carry out their plan and the ride they took with the victim gave them the opportunity to do it. Robert was driving the car at the time the shooting occurred. The defendant asked Robert for the gun in the car and Robert handed it to him just before he pointed it at the victim in the back seat of the car. The defendant's admissions to his uncle, Lucille, and the neighbor were evidence that they had carried it out as was the coverup concerning removal of the blood and bloodstains from the car and shifting most of the blame for the crime onto Lucille's husband. The gun and bullets, which the defendant attempted to hide, were tied to the crime. From the manner of the killing, multiple shots at close range, the jury could have concluded beyond a reasonable doubt that the plan was specifically to kill the victim rather than merely to do him some lesser harm.

There is no error.

In this opinion the other judges concurred.