## STATE OF CONNECTICUT *v.* LOUIS ROULEAU
### (12934)

Peters, C. J., Healey, Shea, Santaniello and Kulawiz, Js.

Argued February 6—decision released June 30, 1987

*G. Douglas Nash,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Ann H. Rubin,* special assistant state's attorney, with whom, on the brief, was *John Connelly,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant, Louis Rouleau, was found guilty of one count of each of the following crimes: aiding robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8;[1] conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 and 53a-48;[2] aiding kidnapping in the

[1] General Statutes § 53a-134 (a) (2) provides: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon."

General Statutes § 53a-8 provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-134 provides in part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under

first degree with a firearm in violation of General Statutes §§ 53a-92 (a)[3] and 53a-8; and conspiracy to commit murder in violation of §§ 53a-54a and 53a-48 (a).[4]

On appeal, the defendant's sole claim is that the trial court erred in its instructions to the jury on the defense of duress. General Statutes § 53a-14.[5] Essentially, the defendant claims that the trial court erred in its instruction on this nonaffirmative defense because it did not instruct that the burden of proof was on the state to disprove that defense beyond a reasonable doubt and/or because it stated that the burden of proof on that defense was on the defendant. In addition to claiming plain error, he also maintains that these errors violated his constitutional rights and, alternatively, his statutory rights. We find error in the charge on duress and order a new trial except for the count on which the defendant was convicted of conspiracy to commit robbery, where we deem the error to have been harmless beyond a reasonable doubt.

circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[3] General Statutes § 53a-92 provides in part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

[4] The jury found the defendant not guilty of one count charging the crime of sexual assault in the first degree with a deadly weapon in violation of General Statutes § 53a-70a.

[5] General Statutes § 53a-14, entitled "Duress as defense," provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

Initially, we note that the defendant did not submit a request to charge on the applicable burden and standard of proof and did not except to the court's instruction on duress. The state therefore contends that the claimed error is not reviewable either as plain error; see Practice Book § 4185 (formerly § 3063); or under the *Evans* bypass rule. See *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). The defendant claims review under both. We will review this claim under the *Evans* rule and, so, need not address the plain error rule. We do so under the second "exceptional circumstance" of *Evans* because "the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." Id., 70.

A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Miller,* 186 Conn. 654, 660, 443 A.2d 906 (1982). This fundamental constitutional right includes proper jury instructions on the burden of proof on the defense of duress so that the jury may ascertain whether, under all the circumstances, the state has met its burden of proving beyond a reasonable doubt that the crimes charged were not committed under duress. "Duress . . . [is a ] recognized [defense] to [a] criminal [charge] because [it] . . . implicate[s] the volitional aspect of criminality." *State* v. *Pierson,* 201 Conn. 211, 217, 514 A.2d 724 (1986); see *State* v. *Miller,* supra, 660–61. The state's burden of proof beyond a reasonable doubt encompasses, in an appropriate case, a burden of disproving duress beyond a reasonable doubt. See General Statutes § 53a-12 (a); see also *State* v. *Pierson,* supra; *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986); *State* v. *Miller,* supra. We note that the state does not claim that an instruction on duress should not have been given; indeed, the trial judge himself decided that there was evidence that justified such an instruction.

Before focusing on the defendant's specific claims of error, it is helpful to set out certain evidence that was before the jury. About noon on April 13, 1985, Paris Zeller, Richard Atherton and the defendant were riding around Waterbury in Atherton's van. They met Stacey Moss in a parking lot. Moss was upset because her boyfriend, KK, could not get out of jail and she wanted to help him out. Moss asked them to help her get one hundred dollars to get KK out on bond. At the time this request was made, Moss, Moss's Uncle Burt, Atherton, Zeller and the defendant were present. Moss, Atherton, Zeller and the defendant then drove around to see if they could find Danny Edwards or "someone to get some money." After dropping off Moss and Atherton at a Pathmark store, Zeller and the defendant, who was now driving the van, came upon Edwards. They told Edwards that KK was in jail and that they "needed some money to get him out." Edwards had no money. These three then picked up Atherton and Moss. Edwards and Moss left the van for a time; Moss did so in an endeavor to obtain some money in return for performing an act of prostitution. Edwards returned with Robert Perugini, and Moss also reappeared but she had no money. There were now six persons in the van, Atherton, Edwards, Perugini, Moss, Zeller and the defendant, who was then the driver. They talked about robbing a store, about picking up a "faggot" and they finally "decided on picking up a whore and taking her money." All six agreed to do this. No one got out of the van, no one asked to get out and no one was forced to stay in the van. They decided to put up a blanket so that when they picked up the prostitute, she could not see anyone in the back of the van. After they put up the blanket, Zeller, Moss, Perugini, Edwards and the defendant got in the back behind the blanket. Atherton stayed in the front and drove.

It was now approximately 1:45 a.m. on April 14, 1985. The victim, who was a prostitute, left her Water-

bury apartment to go to a convenience store to buy some cigarettes. After buying the cigarettes, she began walking toward her house; she had about nineteen dollars on her person. She was approached by a van in which she observed only one person, the male driver, whom she did not know. He offered her a fee to have sex with him. She got into the van and he offered her twenty dollars which she took. She could not see into the back as there "was a curtain or something there." She directed him to a parking lot and when they got there and shortly after she had instituted oral sex, she "had a gun pointed [at her] from the back [of the van]." She saw and felt the gun "because it was right to [her] temple." She was pulled into the back of the van; her eyes were covered by "their hands." Once in the back, a plastic bag was placed over her head[6] and she was made to lie on her stomach. The defendant and Edwards held the victim down and searched her for money. As they searched her, they kept telling her, "You're a hooker. [We] know you have more money than this on you." They took her clothes partially off and took her money, including nineteen dollars from her shoe. While the victim was being held down, the two women, Moss and Zeller, moved to the front of the van. Although the victim could only see shadows through the plastic bag, she determined from the voices that there were four men and two women in the van.[7] The victim was forced to engage in sexual intercourse five times during which her hands were tied and the van was moving. The gun was still present in the back

[6] The plastic Pathmark bag, through which she could only see shadows, remained on her head the entire time that the victim was in the van. There was a hole in the bag where her assailants "had ripped it so [she] could breathe in the bag."

[7] There was evidence before the jury that the victim was kept in the van until "about daybreak" which was the time at which the van stopped in Thomaston and the victim was taken out of it by Atherton and Perugini. At that time, it was "light enough for [the victim] to see."

of the van as "they like had me feeling it and they kept saying, you know, '[i]t's still here.'"

After the two women had joined Atherton in the front of the van, Atherton stopped the van and got in the back.[8] Atherton "asked" the defendant to drive. While the defendant was driving the van, he stopped at a store, Moss and Zeller left the van to purchase some soda and then returned. After the sexual assaults, Moss and Zeller, who had been riding in front, told the defendant that they wanted to be dropped off so that they could go home. The defendant dropped off the two women and Edwards in downtown Waterbury. At the time Moss, Zeller and Edwards got out of the van, one of the women said, "You might as well go ahead and kill her. She's going to go to the police." No one else tried to get out of the van at that time.

The defendant drove the van for some time until Atherton told him to stop. When he did so, they were in a secluded wooded area in Thomaston. Atherton and Perugini then took the victim out of the van, leaving the defendant alone in the van. At that time, the plastic bag was still over the victim's head and her hands were still tied. The victim was walked by Atherton and Perugini through some bushes, over some gravel, over railroad tracks into more gravel and then to "clear ground." In the clearing, the bag was removed from her head and Atherton pointed a gun at her.[9] As he held the gun on her, Atherton told her that "he didn't want to do it but he had to." The first shot that he fired hit a can opener that she had in her jacket pocket and "just bruised" her chest. He fired again, grazing her finger. During this time, the defendant stayed in the

---

[8] The victim testified that Atherton came into the back of the van and sexually assaulted her *after* the other three males had done so. The jury found the defendant not guilty of the crime of sexual assault in the first degree.

[9] She later identified both Atherton and Perugini for the police.

van and waited. He testified that he heard three gun-shots, not two, and that "he started the van up" after he heard the first shot.

After the shots had been fired at her, the victim attempted to run into a nearby river but came back out because the water was too deep and she couldn't swim because her hands were still tied. The two men then tried to choke her with some wire but she prevented them from doing so. One of them then struck her on the head with a "boulder," cutting her. They also beat her with a board with nails in it cutting her buttocks. She then picked up a "large stick" and a rock and started chasing the two men. She did not know at that time where the van was. The defendant then saw her chasing after them. The two men got in the van and, with the defendant driving, left the scene but not before the victim struck the van with the stick she had picked up.

Thereafter, the victim walked to a nearby house from which the owner called the Thomaston police. Later that day, the victim went with the Thomaston police to the area of the attack. The police found a white plastic bag with a Pathmark label and the victim identified it as the one that had been placed over her head. Approximately two days later, the Thomaston police were contacted by Atherton's wife. The police thereafter obtained a search warrant for Atherton's van. After a further investigation, the police arrested the defendant, Atherton, Edwards, Perugini, Moss and Zeller.[10]

The defendant testified as the sole witness for the defense. He stated that "[he] didn't participate in any of [the] crimes." Although admitting that he was in the

[10] At the defendant's trial, Zeller testified for the state and the defendant testified in his own behalf. None of the remaining four who had been arrested testified at the trial.

van, he maintained that he was acting under duress. After drinking alcohol and smoking pot "for a long time that day," he fell asleep in the back of the van and when he "came to," there was a stranger in the back of the van and he asked who she was and what they were doing to her. They told him that she was a prostitute whom "they had picked up" and that they were "trying to rob her." The defendant said that he told them that "[he didn't] want anything to do with this." The defendant testified that Atherton had told him "to get in the front of the van and drive," to which the defendant had replied, "I don't want to." Atherton then "turned around and said in a real nasty voice, 'well, you better get up front and drive.'" The defendant then went up front to drive the van, doing so "at the command of Atherton." In contradiction to Zeller's testimony, the defendant maintained that he had not participated in a conversation planning the robbery, nor did he agree to commit a crime. All he did was drive; he did not rape the victim nor hold her down while she was being robbed. He felt that "his life was in jeopardy if [he] tried to leave the van." This was because he "didn't know [Atherton] that well [and because of] the way [Atherton] told [him] to get in front." The gun, he said, was fired twice out the window "next to my head" while he was driving and while the victim was in the van.

Certain general principles will be useful in our discussion of the specifics of the defendant's claim. "Duress . . . excuses a crime when another's unlawful threat of death or serious bodily injury reasonably causes the defendant to do a criminal act in a situation in which there was no other opportunity to avoid the threatened danger." *United States* v. *Michelson,* 559 F.2d 567, 569 (9th Cir. 1977); see also *United States* v. *McClain,* 531 F.2d 431, 438 (9th Cir. 1976), cert. denied, 429 U.S. 835, 97 S. Ct. 102, 50 L. Ed. 2d 101 (1977). "The ration-

ale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question . . . [but] rather it is that, even though he had done the act the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude." 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.3a. The United States Supreme Court, in speaking to the defenses of duress and necessity[11] has said: "Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail. [W. LaFave & A. Scott, Criminal Law p. 379]." *United States* v. *Bailey,* 444 U.S. 394, 410, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980).

General Statutes § 53a-14 provides that *"it shall be a defense* that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress . . . shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress." (Emphasis added.) Because § 53a-14 declares that duress "shall be a defense" and not an affirmative defense, we look to § 53a-12 to determine the allocation of the burden of proof.[12] Section 53a-12 (a) provides that "[w]hen a

_____

[11] In *United States* v. *Bailey,* 444 U.S. 394, 100 S. Ct. 624, 62 L. Ed. 2d 375 (1980), the court noted that "[m]odern cases have tended to blur the distinction between duress and necessity."

[12] Contrary to the dictum contained in *State* v. *Rosado,* 178 Conn. 704, 708, 425 A.2d 108 (1979), the following defenses are not affirmative

defense other than an affirmative defense, is raised at trial, the state shall have the burden of disproving such defense beyond a reasonable doubt." Whether the defense of duress was "raised" at the trial must be determined by viewing the record in a light most favorable to the defendant's claim. *State* v. *Cassino,* 188 Conn. 237, 241, 449 A.2d 154 (1982); see *State* v. *Fuller,* supra, 278.

We turn to the challenged instruction on duress[13] as given by the trial court. In asserting error, the defendant points to: (1) the failure of the trial court to instruct that under § 53a-12 (a) the state had the burden of proof on this defense and was required to disprove the defense beyond a reasonable doubt; (2) the misstatement that the burden of proof was on the defendant; (3) the "misleading and confusing" statement that the

defenses: ignorance or mistake, General Statutes § 53a-6; intoxication, § 53a-7; renunciation of criminal purpose, § 53a-10; duress, § 53a-14; entrapment, § 53a-15; justification, § 53a-16, as defined in §§ 53a-17 through 53a-23; and renunciation of criminal purpose in a conspiracy charge, § 53a-48.

[13] The trial court's instructions included the following: "Now, we also have a statute that provides that in any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use of threatened imminent use of force upon him, which force or threatened force a person of reasonable firmness in this situation would have been unable to resist.

"The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress.

"Now, in this case, if the defendant has proved this defense of duress and he proves it against all five counts, it is a defense that he was coerced by the use of threatened imminent use of force upon him, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

"The defense of duress as defined is not available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

There is no claim that, during its jury instructions, the trial court referred to the defense of duress other than in the challenged instructions. Our examination of the entire charge confirms this fact.

defendant had to prove the defense of duress "against all five counts"; and (4) the failure to state anywhere in its instructions that the jury had to find the defendant not guilty if this defense was not disproved. He states that it is reasonably possible that these omissions and misstatements combined to confuse the jury.

The state maintains that, viewing the charge as a whole, the trial court did not omit or misstate the burden and standard of proof in a manner harmful to the defendant. In arguing for the analysis of the charge as a whole, the state disagrees that "this isolated misstatement" requires, as the defendant claims, the reversal of four convictions. It also argues that there is nothing in the record to support the claim that the alleged omissions and misstatements combined to confuse the jury. The state maintains that to construe the language referring to the defendant's need to prove this defense "against all five counts" imposes an "entirely unreasonable interpretation" on the trial court's language "contrary to its plain meaning, and contrary to common sense." The state also challenges the defendant's claim that the trial court erred in failing to instruct the jury that it had to find him not guilty if it found that the state had not disproved the duress defense beyond a reasonable doubt. It asserts that there is no merit to that claim because the trial court charged the jury at least four times that it must find the defendant not guilty if it found the state had not proven each essential element of each crime charged beyond a reasonable doubt.

" ' "The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result." *State* v. *Mullings,* 166 Conn. 268, 275, 348 A.2d 645 [1974]; *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277 [1973].' *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977)." *State* v. *Stepney,* 191 Conn. 233, 247,

464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 722, reh. denied, 446 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). It is well established that jury instructions must be read as a whole and that individual instructions are not to be judged in "artificial isolation" from the overall charge. *Cupp* v. *Naughten,* 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). Although the *Cupp* court stated, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," that court also recognized that that "does not mean that an instruction by itself may never rise to the level of constitutional error . . . ." *Cupp* v. *Naughten,* supra, 146–47; see *Cool* v. *United States,* 409 U.S. 100, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972). The due process clause "protects the accused against conviction except upon proof [by the state] beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); accord *Patterson* v. *New York,* 432 U.S. 197, 210, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). As we have already noted, the defendant has a constitutional right to have the jury adequately instructed in order to guarantee him a fair trial. Moreover, this right directly implicates the requirement of correct instructions on the standard of proof as well as the burden of proof. A misstatement of the law is more likely to be prejudicial than an omission or incomplete instruction. *Henderson* v. *Kibbe,* 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); *State* v. *Kurvin,* 186 Conn. 555, 563, 442 A.2d 1327 (1982); see *State* v. *Preyer,* 198 Conn. 190, 198–99, 502 A.2d 858 (1985).

Turning to the claimed errors, we conclude, not only from the instruction on duress itself but also from a

careful review of the overall charge, that the trial court did not instruct the jury that under the statute the state had the burden of disproving the defense of duress beyond a reasonable doubt. Rather, the language of the challenged instruction discloses that the trial court not only omitted crucial instructions but also misstated the law. It told the jury that "if the defendant has proved this defense and he proves it against all five counts, it is a defense that he was coerced . . . . " The defendant, of course, did not have to prove the defense. Moreover, the defense did not have to be available to him with respect to each and every one of the five counts with which he was charged. Rather, to convict the defendant on any one or more of the crimes charged against him, the state was required to show that he was not acting under duress as to any such crime. See *United States* v. *Campbell,* 609 F.2d 922, 925 (8th Cir. 1979), cert. denied, 445 U.S. 918, 100 S. Ct. 1282, 63 L. Ed. 2d 604 (1980); *United States* v. *Hearst,* 563 F.2d 1331, 1336 (9th Cir. 1977), cert. denied, 435 U.S. 1000, 98 S. Ct. 1656, 56 L. Ed. 2d 90 (1978); *Commonwealth* v. *Robinson,* 382 Mass. 189, 201, 415 N.E.2d 805 (1981).

As a matter of due process, the state bore the burden of disproving duress beyond a reasonable doubt. *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *Commonwealth* v. *Robinson,* supra, 200–201, 206. The jury, however, was not instructed that the standard of proof beyond a reasonable doubt which was the burden that rested on the state throughout also applied to the defense of duress. The trial court not only omitted this instruction but misstated the allocation of the burden on that statutory defense. This analysis is not a critical dissection of the charge nor an assessment of it in "artificial isolation" from the charge as a whole.

The state claims that the overall charge renders any such error harmless. We do not agree. It is true that

the state's general burden of proof beyond a reasonable doubt was given a number of times as well as its burden to prove every essential element of every crime charged. This case does not present a situation such as in *State* v. *Torrence,* 196 Conn. 430, 437, 493 A.2d 865 (1985), to which the state refers us in arguing that we should find harmless error. In *Torrence,* we found the solitary misstatement not to constitute harmful error because on at least two other occasions, the court gave the correct charge. By contrast, in this case the instruction on duress was given only once, it was incorrect and it was never corrected. There is no reference elsewhere in the overall charge to this defense. We cannot say that the instructions elsewhere in the charge concerning the standard of proof and burden of proof "cured" the challenged instruction. This is not only because of the affirmative misstatement, as well as the omission noted, but also because as the *only* instruction on this statutory defense in the entire charge, it hardly furnished adequate instructions for the proper guidance of the jury. It is to be presumed that the jury followed the court's instructions unless the contrary appears. *State* v. *Williams,* 202 Conn. 349, 363–64, 521 A.2d 150 (1987); *State* v. *Barber,* 173 Conn. 153, 156, 376 A.2d 1108 (1977); *State* v. *DellaCamera,* 166 Conn. 557, 567, 353 A.2d 750 (1974).

The necessity for correct instructions on the burden of proof on the defense of duress becomes especially significant when it is realized that, in a proper case, duress is a defense to what would otherwise be a crime. See *United States* v. *Bailey,* supra, 409–11; *United States* v. *Agard,* 605 F.2d 665 (2d Cir. 1979); *Commonwealth* v. *Thurber,* 383 Mass. 328, 418 N.E.2d 1253 (1981); *Commonwealth* v. *Santiago,* 462 Pa. 216, 340 A.2d 440 (1975); see 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.3; R. Perkins, Criminal Law (2d Ed. 1957) p. 949 et seq. In a word, the defendant was

entitled to a correct charge concerning the burden of proof on duress, a defense which is "a legal excuse for criminal conduct." *United States* v. *Agard,* supra, 667; see *State* v. *Knapp,* 147 Vt. 56, 509 A.2d 1010 (1986); annot., 40 A.L.R.2d 908. The ultimate effect of the state's failure to discharge its burden of disproving the defense of duress was aptly stated by the Massachusetts Supreme Judicial Court when it said: "Yet if the effect of duress, as defined, is to reduce the person to a state of involuntariness or automatism, see Model Penal Code § 2.09, Comment at 6 (Tent. Draft No. 10, 1960), then duress may be seen as removing the very basis of criminal culpability, see Model Penal Code § 2.01 (2) (d) (Proposed Official Draft 1962), with due process implications as regards burden of proof." *Commonwealth* v. *Robinson,* supra, 203–204.

In addition, it was error to charge that the defense need be proved as against all the counts of the information. It was especially inappropriate to do so in this case where, on the evidence before the jury, certain of the crimes charged were not only in different temporal contexts but also involved different participants. It follows from this that a proper instruction could have permitted a finding of duress as to certain of the crimes charged and not others. Moreover, nowhere in its instructions on duress, or elsewhere in the charge, did the court instruct that the defendant was required to be found not guilty if the state did not disprove it beyond a reasonable doubt. At most, the trial court's instructions on duress conveyed to the jury a confusing and imprecise notion that the oft-repeated standard of proof beyond a reasonable doubt that was the state's burden might possibly apply to the defense of duress. Under relevant legal principles, the charge on duress was harmfully erroneous. In *State* v. *Fuller,* supra, 280, we said that the trial court's instructions "did not relate duress to intent or explain to the jury that duress

negated intent or that, if the state proved intent beyond a reasonable doubt, it disproved duress beyond a reasonable doubt," pointing out that the failure to convey that nexus left the jury "to its own devices to determine the relationship between intent and duress." There we also pointed out that we were "not persuaded that simply instructing the jury that it was the state's burden to prove intent beyond a reasonable doubt [as the trial court generally did in this case] adequately informed the jury that it was the state's burden to disprove duress beyond a reasonable doubt." Id. Viewing the charge as a whole, we hold that the erroneous instructions were not overcome by the overall charge; the interests of justice require the conclusion of harmful error. *State* v. *Theriault,* 182 Conn. 366, 380, 438 A.2d 432 (1980); *State* v. *Williams,* 182 Conn. 262, 267–69, 438 A.2d 80 (1980).

In the constitutional context of this case, in considering, as we must, the jury charge "from the standpoint of its effect on the jury in guiding them to a proper verdict"; *State* v. *Bell,* 153 Conn. 540, 544, 219 A.2d 218 (1966); the next issue is whether it is reasonably possible that the jury was misled by the charge. *State* v. *Cobb,* 199 Conn. 322, 325, 507 A.2d 457 (1986); *State* v. *Williams,* supra, 269. It is clear that the charge was not " 'accurate in law, adapted to the issues and adequate to guide the jury in reaching a correct verdict.' " *State* v. *Williams,* supra; *State* v. *McDermott,* 190 Conn. 20, 25, 458 A.2d 689 (1983). It follows from what we have already said that it is reasonably possible that the jury was misled by the charge. A new trial is required.

Our order of a new trial, however, does not end our inquiry. The issue now arises as to which of the four crimes, of which the defendant was found guilty, a new trial is required. The defendant argues that he is entitled to a new trial on all four crimes of which he

was found guilty. The state, on the other hand, argues that the convictions on each of the four crimes be affirmed. The oral arguments on this appeal, as well as the records and briefs, provide some insight into this issue. A careful examination of the record before us, including the transcript of the trial proceedings, leads us to conclude that, given the harmful error we have found, the new trial is ordered on three of the counts of which the defendant was found guilty at trial. A new trial is ordered on: (1) aiding robbery in the first degree, General Statutes §§ 53a-134 (a) (2), 53a-8; (2) aiding kidnapping in the first degree with a firearm, General Statutes §§ 53a-92a, 53a-8; and (3) conspiracy to commit murder, General Statutes §§ 53a-54a, 53a-48.[14] A new trial is ordered as to these three crimes because the error in the jury charge impacted on these three crimes.

No new trial, however, is ordered on the crime of conspiracy to commit robbery in the first degree. General Statutes §§ 53a-185, 53a-48. A close review of the evidence at the trial demonstrates that the harmful error in the trial court's instructions could not have tainted this conviction because there was no evidence before the jury which, if credited, would support a finding that the defendant had been subjected to duress at the time of the commission of the crime of conspiracy to commit robbery. We say this recognizing, as we did in *Fuller,* that " '[a] defendant is "entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." ' " *State* v. *Fuller,* supra, 278. There was no evidence of duress, either

[14] According to the judgment file, these crimes were the first, fourth and fifth counts of the substitute information. The jury found the defendant not guilty of the third count which charged the crime of sexual assault in the first degree with a deadly weapon in violation of General Statutes § 53a-70a.

"weak" or "incredible," which implicates the crime of conspiracy to commit robbery in the first degree. General Statutes §§ 53a-48, § 53a-134.

" 'To establish the crime of conspiracy under Section 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed.' *State* v. *Ortiz,* 169 Conn. 642, 645, 363 A.2d 1091 (1975). The conspiracy may be proved through circumstantial evidence. *State* v. *Hayes,* 127 Conn. 543, 554, 18 A.2d 895 (1941)." *State* v. *DeMatteo,* 186 Conn. 696, 707, 443 A.2d 915 (1982); *State* v. *Beccia,* 199 Conn. 1, 3, 505 A.2d 683 (1986). " 'The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy. *State* v. *Devine,* 149 Conn. 640, 647, 183 A.2d 612, cert. denied, 371 U.S. 930, 83 S. Ct. 303, 9 L. Ed. 2d 237 (1962)." *State* v. *Stevens,* 178 Conn. 649, 655, 425 A.2d 104 (1979). "On appeal, this court construes the evidence in the manner most favorable to sustaining the conviction. *State* v. *Gunning,* 183 Conn. 299, 309, 439 A.2d 339 (1981)." *State* v. *DeMatteo,* supra. It is apparent from the evidence we have set out above that the jury could reasonably have found that there existed between the defendant and his associates a mutual agreement or plan to commit robbery in the first degree, which was followed by an overt act in furtherance of the conspiracy, in violation of General Statutes §§ 53a-134, 53a-48.

The defendant's version of events, including his denial of any participation in the conspiracy to commit robbery, does not require a contrary conclusion.

This is so because there is no evidence of duress in this case that implicates the state's evidence, principally from Zeller, on the conspiracy to commit robbery count, which the jury credited, thus furnishing the basis for a guilty verdict on that count. In addition, the defendant's version of the facts tending to show duress, even if it had been credited, would have had no bearing on this conspiracy count. The duress testified to by the defendant occurred after the crime of conspiracy to commit robbery in the first degree had taken place. Therefore, there is no error on the guilty verdict on the charge of conspiracy to commit robbery in the first degree.

There is error in part, the judgment is set aside as to the first, fourth and fifth counts of the substitute information and the case is remanded for a new trial on those counts. There is no error on the second count of the substitute information.

In this opinion the other justices concurred.