STATE OF CONNECTICUT *v.* BILL-ROY HENDERSON
(AC 24041)

Dranginis, Flynn and Hennessy, Js.

Argued February 10—officially released July 13, 2004

*Jon L. Schoenhorn,* with whom was *Matthew D. Dwyer,* for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Bill-Roy Henderson, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48, murder in violation of General Statutes §§ 53a-54a and 53a-8, and tampering with a witness in violation of General Statutes §§ 53a-151 and 53a-8. On appeal, the defendant claims that the trial court improperly (1) denied his motion for a new trial and (2) admitted evidence of prior uncharged misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 24, 1996, Michael Wright, the principal witness for the state, pistol-whipped and then shot and killed the victim, Hayfield Hemley.[1] Wright testified that he and the defendant had developed a close relationship through their years of selling illegal drugs together. He testified that the defendant had ordered him to kill Hemley. Wright stated that he had agreed to do so out of loyalty and friendship to the defendant. At trial, Wright explained that he had chosen to testify against the defendant because the defendant had ordered two witnesses, Oreville Lipscome and Franz Murray,[2] to tes-

---

[1] Wright was arrested, tried and, after a trial by jury, convicted of assault and conspiracy to commit assault. The jury deadlocked on the murder and tampering charges. His total effective sentence was forty-five years to serve, suspended after thirty-five years. Subsequently, Wright was retried on the murder and tampering charges. The jury again deadlocked on those charges. He then pleaded guilty to a charge of manslaughter in the first degree and was sentenced to thirteen years of incarceration to run concurrent with his sentence of forty-five years.

[2] Lipscome and Murray worked in the defendant's drug ring and participated in arranging the confrontation between the victim and Wright.

tify against him at his trial. That had angered Wright because he was serving what practically amounts to a life sentence for doing the defendant's bidding. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly denied his motion for a new trial on the ground that the state did not disclose to him a benefit promised to Wright in exchange for his testimony.

The following facts are relevant to the defendant's claim. The court accepted the jury's verdict of guilty on November 5, 2001. On November 27, 2001, before the defendant's sentencing, Wright wrote a letter to assistant state's attorney David Zagaja expressing hope that Zagaja would honor his commitment to arrange for Wright to serve his time "in a federal prison that is decent" in return for his testimony against the defendant.[3] A copy of that letter was given to the defendant's attorney, who, on January 4, 2002, filed a motion for a new trial.[4] After an evidentiary hearing, the court denied the defendant's motion.

The defendant claims that the state suppressed the alleged agreement that it made with Wright, which was that he would be moved to a different correctional facility in return for his testimony at trial. The defendant contends that the agreement was exculpatory information and material to the determination of his guilt or

---

[3] The letter stated in relevant part: "One year ago you came to me and ask for a certain individual head on a platter and I deliver. One thing that I stress to you was to go to a federal prison that is decent and you assure me that this was no problem . . . ."

[4] The motion for a new trial alleged that (1) the defendant or his counsel were not informed of certain benefits being offered to Wright, (2) the jury was led to believe that the state had offered nothing of value to Wright in exchange for his testimony and (3) the defendant's right to confront the witnesses against him was impaired by counsel not being able to cross-examine Wright properly on those benefits.

innocence. He claims that this information was withheld in violation of the due process clauses of the state and federal constitutions, the General Statutes and our rules of practice. We disagree.

"Connecticut has long recognized petitions for new trials based on newly discovered evidence. . . . The modern standard, or an equivalent formulation, adopted by a majority of state and federal courts for granting such a petition is based on the landmark case of *Berry* v. *State*, 10 Ga. 511 (1851). Connecticut adopted this general standard as early as 1880 in *Hamlin* v. *State*, 48 Conn. 92, 93 (1880), and has since applied it in a long line of cases. . . . Under this standard, a new trial is granted if the petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence (1) is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence, (2) would be material on a new trial, (3) is not merely cumulative, and (4) is likely to produce a different result in a new trial. . . . In analyzing the foregoing factors, trial courts are guided by the general principle that a new trial should be granted because of newly discovered evidence only if an injustice was done or it is probable that on a new trial a different result would be reached. . . . The scope of review of a trial court's decision to grant a new trial on the basis of newly discovered evidence is limited to whether the trial court abused its discretion. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *State* v. *Weiner*, 61 Conn. App. 738, 751–52, 767 A.2d 1220, cert. denied, 256 Conn. 902, 772 A.2d 600 (2001).[5]

---

[5] The defendant filed a motion for a new trial in accordance with Practice Book § 42-53 (a), which provides in relevant part that "[t]he judicial authority may grant a new trial if it is required in the interests of justice. . . ."

The defendant claims that the contents of Wright's letter were of an exculpatory nature that, therefore, constituted newly acquired evidence. He contends that his right to confront witnesses and to cross-examine Wright, was impaired by the state's failure to disclose the existence of the agreement. We disagree.

"The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms*, 201 Conn. 395, 405 and n.8, 518 A.2d 35 (1986). In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . . It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused. . . . A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 736–37, 756 A.2d 799 (2000).

We must first consider whether there was an undisclosed agreement between the state and Wright offering Wright incarceration in "a federal prison that is decent" in return for his testimony against the defendant. See id., 737. The existence of an undisclosed agreement is an issue of fact to be determined by the trial court, and the defendant has the burden of proving the existence of undisclosed exculpatory evidence. Id. The court conducted an evidentiary hearing on the motion for a new trial on the basis of an alleged *Brady* violation. The

court concluded that "there were no promises made, expressed or implied, to procure Wright's testimony [and] since no promises were made, the existence of those promises was not suppressed."

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 253 Conn. 737. Our review of the record reveals that the facts set out in the court's memorandum of decision are supported by the evidence and, therefore, are not clearly erroneous.

The record shows that Wright was placed in protective custody for his own protection, a placement that he did not request and did not consider to be a benefit. Wright made it clear that he wanted to be moved out of protective custody and placed in the general population of whatever facility in which he would be serving his sentence. At the hearing, Wright stated numerous times that he was not promised placement in a different correctional facility on the basis of the outcome of the defendant's trial.[6] Moreover, the record makes clear

---

[6] At the hearing on the motion for a new trial, Wright testified in relevant part on cross-examination by the state:

"[The Prosecutor]: Was it ever presented to you through [state division of criminal justice] Inspector [James C.] Rovella that you would be moved out of state if convictions were obtained?

"[The Witness]: No."

Thereafter, on redirect examination, Wright testified as follows:

"[Defense Counsel]: Did you take that to mean, sir, that your placement in a state or federal facility would have to wait until the outcome of the trial?

"[The Witness]: No, I took it as regardless of what happened in that trial I was getting moved. Either send me back to [the MacDougall-Walker Reception/Special Management Unit] or send me out of state, but get me out of (protective custody)."

that although he desired placement in a federal prison, Wright never received a promise of such placement by the state.[7] We therefore conclude that the court's finding that there was no credible evidence that would show the existence of any express or tacit agreement that the state would transfer Wright to a federal prison to reward him for testifying was not clearly erroneous. We further conclude that it was not an abuse of the court's discretion to deny the defendant's motion for a new trial because the allegedly newly discovered evidence did not show that an injustice was done or that it was probable that a different result at trial would have been reached.

## II

The defendant next claims that the court improperly admitted evidence of prior uncharged misconduct because the evidence was not relevant and any probative value it had was outweighed by its prejudicial effect. We disagree.

The factual basis underlying the defendant's claim is as follows. Prior to trial, the court held a hearing on the defendant's motion in limine to preclude evidence of prior uncharged misconduct. Wright testified for the state regarding his close relationship with the defendant. He explained that he met the defendant through

---

[7] At the hearing, Wright testified in relevant part as follows on cross-examination by the state:

"[The Prosecutor]: . . . Was the representation ever made to you by the state's attorney's office . . . that you would be transferred to a federal prison?

"[The Witness]: What he told—what he—what [state division of criminal justice] Inspector [James C.] Rovella told me, he can't promise exactly where I will go, but they have to—being that they have to ship me, if they ship me, they'll ship me out of state, but he couldn't exactly. But I—that was my—that was my preference. But he's like, he can't promise me that because it's up to [the] department of correction.

"[The Prosecutor]: Which department of correction? Connecticut?

"[The Witness]: Yes."

his cousin, a close friend of the defendant. At first, the defendant allowed Wright to sell drugs on consignment. Eventually, Wright was allowed to sell drugs on the defendant's behalf. The defendant controlled the type of drugs sold, the location of the sales and the identity of his dealers. Wright claimed that he joined six or seven people who worked with the defendant dealing drugs, taxing or extorting from others and, on several occasions, committed armed robberies[8] of other drug dealers in the area. Wright further testified that he and the defendant, who planned the robberies, were always armed. He stated that as a result of their relationship, he was loyal to the defendant and, therefore, when the defendant asked him to kill the victim, he carried out the request.[9]

At trial, the court found that this evidence was probative of intent and motive, while the relationship between Wright and the defendant was relevant to the existence of a conspiracy. The court further found that the probative value of the evidence outweighed any prejudicial effect it may have had against the defendant. The defendant contends that individually, each of those instances of prior uncharged misconduct was irrelevant and, therefore, inadmissible. We disagree.

"As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. . . . Such evidence is

---

[8] They would demand that a drug dealer, not affiliated with the defendant's group, give them drugs on consignment with no intention of ever paying him. If the person did not hand over the drugs, they would rob him.

[9] Apparently, the victim had threatened to kill the defendant. Wright testified that the defendant was "pissed because [the victim] threatened to kill him, and that's something you just don't do. You don't threaten to kill somebody and don't follow through with it."

admissible for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity. . . . Our analysis of whether evidence of the uncharged misconduct is admissible is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161–62, 665 A.2d 63 (1995).

"The standard of review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Aggen*, 79 Conn. App. 263, 270–71, 829 A.2d 919 (2003).

In this case, Wright's testimony depicting the defendant as the leader of a tight-knit group run according to his strict rules regarding their drug sales, i.e., the location where the transactions would take place, the amount each person could sell and the distribution of the proceeds, was relevant to show the nature of the relationship between Wright and the defendant. He stated that he had known the defendant for thirteen years, they were like brothers and would have done anything for one another. Their relationship was further evidenced by Wright's testimony about their involvement in armed robberies and about an occasion when the defendant convinced Wright to resist retaliating against a man who had shot and injured him. The depth and type of relationship, viewed in the context of the environment in which they lived, was relevant to

explain the rationale behind the defendant's request that Wright kill the victim and Wright's acquiescence in that request. We conclude, therefore, that Wright's testimony regarding the relationship he shared with the defendant was relevant to the charge of conspiracy to commit murder.

We now must determine whether the probative value of the evidence was outweighed by its prejudicial effect. We are aided in our determination by the factors set forth in *State* v. *DeMatteo*, 186 Conn. 696, 443 A.2d 915 (1982): "(1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." Id., 702–703. In doing so, we adhere to the principle that "[t]he primary responsibility for conducting the balancing test to determine whether the evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." *State* v. *George B.*, 258 Conn. 779, 793, 785 A.2d 573 (2001).

The defendant contends that Wright's testimony as to drug sales, extortion and robbery served to unduly arouse the jury's emotions, hostility or sympathy. Those offenses, however, were not the focus of the jury's inquiry. Rather, the testimony was presented as part of the environment in which Wright and the defendant had lived for many years and helped to explain the relationship between the two men, which was relevant to the charge of conspiracy to commit murder. There was no counterproof offered by the defendant as to the acts Wright testified about, and the defendant was well aware that the prior uncharged misconduct would be

brought before the jury. In addition, the court excluded portions of Wright's proposed testimony that in its judgment may have been unduly prejudicial to the defendant. Moreover, the court instructed the jury on more than one occasion: "You are not allowed to consider this other misconduct evidence that you heard some discussion on concerning drug trade, taxing or robberies, possession of firearms, for any other purpose than the relationship the state is seeking to establish."

"Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous. Applying this standard, the court's ruling was proper." *State* v. *DeMatteo*, supra, 186 Conn. 703. We conclude that the court did not abuse its discretion in admitting the evidence of uncharged misconduct against the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.