STATE OF CONNECTICUT *v.* BRIAN COTE
(SC 18014)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued January 3—officially released April 22, 2008

*James A. Wade*, with whom were *Brett J. Boskiewicz*, *Richard M. Fil* and, on the brief, *Jeffrey J. White* and *Ndidi N. Moses*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *John M. Massameno* and *Tamberlyn E.C. Conopask*, senior assistant state's attorneys, and,

on the brief, *Kevin T. Kane*, chief state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Brian Cote, appeals from the judgment of conviction, rendered after a jury trial, of one count each of storage of hazardous waste without a permit in violation of General Statutes (Rev. to 1999) § 22a-131a (b),[1] disposal of hazardous waste without a permit in violation of § 22a-131a (b), and conspiracy to store and dispose of hazardous waste without a permit in violation of General Statutes §§ 53a-48 (a) and 22a-131a (b). The defendant's dispositive claim on appeal is that the trial court improperly charged the jury as to the elements of "disposal" and "storage" by using the definitions of those terms provided in the federal Resource Conservation and Recovery Act of 1976 (federal act), 42 U.S.C. § 6901 et seq., rather than those provided in chapter 445 of the General Statutes, which includes § 22a-131a, governing hazardous waste. We agree and, accordingly, we reverse the trial court's judgment.

The record reveals the following undisputed facts and procedural history. In October, 1996, the defendant and his business partner, Ken Oliver, purchased a 100 year old mill, the former Ponemah Mill Number 3, located at 539 Norwich Avenue in Norwich, for the relocation and expansion of their precision sheet metal manufacturing business, Sound Manufacturing, Inc. (Sound Manufacturing). In addition to the portion of

---

[1] General Statutes (Rev. to 1999) § 22a-131a (b) provides: "Any person who knowingly transports hazardous waste to a facility which does not have a permit required under the Resource Conservation and Recovery Act of 1976, or who knowingly treats, stores or disposes of any hazardous wastes without a permit required under said act, or who knowingly violates any material condition or requirement of such permit, shall be fined not more than fifty thousand dollars for each day of violation or imprisoned not more than two years or both."

the property to be used for that business, the property also had commercial rental space, some of which was already leased. The defendant and Oliver determined that renovations to the mill were necessary. Those renovations included the removal of paint from interior brick walls on the first and second floors and the replacement of the timber floor on the first level with a concrete pad to accommodate Sound Manufacturing's laser calibrated sheet metal fabrication machines. The defendant and Oliver hired a contractor, Charles Lavallee, to perform this work. One of Lavallee's workers, Gerry Pepka, began removal of the interior paint by sandblasting the walls, but stopped shortly thereafter because he was concerned that the paint might contain lead. Pepka purchased a testing kit, which detected lead in the paint. Pepka informed Lavallee of the results, who in turn informed the defendant.

The defendant thereafter hired a state certified lead abatement contractor, A. Gamache Painting and Sandblasting Company (Gamache). Gamache commenced sandblasting at the mill in December, 1996. The sandblasting, which utilized thousands of pounds of sand, resulted in the accumulation of sand mixed with particles of lead paint (sandblast grit). As Gamache finished sandblasting a particular area, Lavallee's workers would remove the sandblast grit and spread it on the ground below where the timber floor had been removed from the first floor of the mill.[2] In multiple phases from March through June of 1997, an eight to ten inch concrete floor was poured over the sandblast grit. In July, 1997, Sound Manufacturing moved onto the property.

In August, 1997, David Stokes, an inspector for the state department of environmental protection (department), came to the mill to investigate a complaint

---

[2] There was conflicting testimony as to whether there was only soil below the timber floor or an asphalt-like substance.

against John Bogdanski, one of the commercial tenants at the mill. During the investigation, Stokes received information that contaminated sandblast grit possibly was buried beneath the concrete floor. The following day, Stokes returned to the mill and asked the defendant whether sandblast grit in fact was buried under the concrete floor. The defendant confirmed that it was.

In October, 1997, a sample of paint was taken from a portion of the mill walls that had not been sandblasted, and samples of the sandblast grit were taken from various locations beneath the concrete floor. These samples registered lead concentration levels well in excess of that deemed hazardous under state law. No one had obtained hazardous waste permits in connection with the handling of the lead contaminated sandblast grit.

Thereafter, in a five count substitute information, the state charged the defendant with: one count of storage of hazardous waste without a permit in violation of § 22a-131a (b); one count of disposal of hazardous waste without a permit in violation of § 22a-131a (b); one count of conspiracy to store and dispose of hazardous waste without a permit in violation of §§ 22a-131a (b) and 53a-48 (a); and two counts of placing another in imminent danger of death or serious bodily injury in violation of § 22a-131a (c).[3] Prior to trial, the state filed a motion in limine to preclude the defendant from pre-

[3] The counts alleging placing another in imminent danger of death or serious bodily injury were based on allegations that the defendant's actions had exposed Bogdanski and one of his employees to lead laden dust during the sandblasting. The count alleging conspiracy related to the defendant's relationship with Daniel Malchman, the person from whom the defendant and Oliver had purchased the mill and with whom the state alleged the defendant had conspired to conceal the toxic nature of the sandblast grit at the mill. The state initially had consolidated the case against the defendant with its case against Malchman. In May, 2004, the trial court granted the defendant's motions to sever the cases and to declare a mistrial. The state filed the operative substitute information in the present case on September 10, 2004.

senting evidence in support of a defense of mistake of law and evidence relating to environmental harm. Specifically, the state sought to preclude evidence that state or local officials had told the defendant that it was lawful to dispose of the sandblast grit under the floor of the mill. The state also sought to exclude evidence that the disposal of the hazardous waste had not caused environmental harm because it contended that such harm was not relevant to "disposal" or "storage" as defined under the federal act. The defendant opposed the motion, contending that whether he had received an official misstatement of the law was a question of fact for the jury. At hearings regarding the environmental harm evidence, the defendant claimed that such evidence was relevant and that the pertinent terms of § 22a-131a (b) were defined by state, not federal, law. The trial court initially denied the motion in limine as to the mistake of law evidence but ultimately granted the motion as to both that evidence and the evidence regarding the absence of environmental harm. As part of its ruling regarding environmental harm, the court concluded that the federal act defined the elements of the offenses.

The defendant testified in his own defense. He acknowledged that Sound Manufacturing had been cited previously by the department for a hazardous waste violation involving paint waste,[4] but stated that he had no recollection to confirm or dispute testimony by Stokes and Diane Duva, another department employee, that the defendant had been given a booklet regarding proper handling of hazardous waste and permit requirements and that the department agents had

---

[4] In 1992, Stokes and another department employee, Diane Duva, had inspected the former site of Sound Manufacturing and discovered environmental law violations relating to the storage of excess paint or paint waste on the premises. The defendant had agreed to have a certified waste management company remove the waste from the premises, and the department issued a citation to the defendant rather than fine him.

informed him that paint does not lose its hazardous properties when it is cured or dried. The defendant admitted that he had authorized the burial of the sandblast grit below the floor, that he knew that the sandblast grit contained lead, that he knew that lead had the potential to be dangerous to people or the environment and that he did not have a permit to bury the sandblast grit under the concrete floor. He contended that he had been led to believe that it was legal to do so. Specifically, he stated that he had been told by Paul Cote, the building inspector for the city of Norwich, who was not related to the defendant, and Gene Gamache, the owner of the state certified lead abatement company that had performed the sandblasting, that disposal of the sandblast grit below the concrete floor was legal.[5] In light of its earlier ruling on the state's motion in limine, however, the trial court instructed the jury that this evidence was not a defense, but was admitted only to explain the defendant's state of mind when he had told Stokes that the burial of the sandblast grit was "no big deal." The defendant also testified that the sandblast grit had been buried on top of an asphalt-like substance that completely covered the ground. In accordance with its ruling precluding evidence of environmental harm, the trial court instructed the jury that this testimony was relevant only to impeach other witnesses' observations of the site where the sandblast grit had been buried.

The jury subsequently rendered a verdict of guilty on three counts of violations of § 22a-131a (b): the storage count; the disposal count; and the conspiracy count. The trial court sentenced the defendant to a term of two years imprisonment, execution suspended after

---

[5] Gamache did not testify because he died prior to the start of the trial. Paul Cote did testify; see footnote 18 of this opinion; but admitted to having some memory impairment because of a stroke he had suffered several months prior to testifying.

one year, for each of the three counts, with the terms to run consecutively. The court also ordered five years of probation for each count. One of the conditions of probation proposed by the state, which the court adopted, required the defendant to pay $1,038,000 into a trust to fund the removal of the contaminated grit and the remediation of the property. The defendant appealed from the judgment of conviction to the Appellate Court, and we then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant claims that the trial court improperly: (1) instructed the jury using the definitions of "storage" and "disposal" as provided under the federal act, rather than state law; (2) precluded evidence regarding a mistake of law defense; (3) precluded evidence demonstrating that no lead had entered the environment; (4) failed to instruct the jury that it could not convict the defendant for both disposal and storage of hazardous waste, as those activities are mutually exclusive under federal law; and (5) ordered remediation as a condition of probation. The defendant further contends that prosecutorial improprieties deprived him of a fair trial. We agree with the defendant's first claim and, accordingly, we reverse the trial court's judgment.

I

The first issue we must determine is whether state or federal law dictates the definitions of "disposal" and "storage" of hazardous waste that constitute violations of § 22a-131a (b). The differences between the definitions under the two schemes could be significant because, as the state concedes in its brief to this court, the state definitions would proscribe a narrower scope of conduct. Compare General Statutes § 22a-115[6] with

---

[6] General Statutes § 22a-115 provides in relevant part: "As used in this chapter . . .

"(3) 'Disposal' means the incineration, long-term storage or treatment of hazardous waste, or the discharge, deposit, injection, dumping or placing

42 U.S.C. § 6903.[7] For example, under state law, "disposal" occurs only when hazardous waste "enters the environment"; General Statutes § 22a-115 (3); whereas under federal law, "disposal" occurs when hazardous waste "may enter the environment . . . ." 42 U.S.C. § 6903 (3).

The defendant contends that the definitions under § 22a-115 control because that statute expressly provides definitions that apply throughout the hazardous waste chapter of the General Statutes, which includes § 22a-131a. The defendant further contends that the definitions under § 22a-115 must apply to avoid rendering § 22a-131a unconstitutionally vague.

Conversely, the state contends that, because § 22a-131a penalizes the storage or disposal of hazardous

of hazardous waste into or on land or water so that such hazardous waste or any hazardous constituent of such hazardous waste enters the environment, is emitted into the air, or is discharged into any waters, including groundwaters . . .

"(5) 'Short-term storage' means the holding of individual containers of hazardous waste in such a manner as not to constitute disposal of such hazardous waste . . .

"(6) 'Long-term storage' means the holding of more than fifty-five gallons or five hundred pounds, whichever amount is greater, of hazardous waste at one site for longer than one year . . . ."

[7] Title 42 of the United States Code, § 6903, provides in relevant part: "As used in this [federal act] . . .

"(3) The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

\* \* \*

"(33) The term 'storage', when used in connection with hazardous waste, means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste. . . ."

We note that the parties appear to agree that state law defines "hazardous waste" more expansively than does federal law; see General Statutes (Rev. to 1999) § 22a-115 (1); but that the material at issue in the present case satisfies both definitions.

waste "without a permit required under [the federal] act," the pertinent terms must be defined in accordance with the federal act. It further contends that the federal definitions must control because the federal Environmental Protection Agency (EPA) authorized Connecticut's hazardous waste management program to operate in lieu of the federal program upon concluding that the state had satisfied the conditions prescribed under federal law, including that the state's program must be equivalent to, and no less stringent than, the federal program. See 42 U.S.C. §§ 6926 (b)[8] and 6929;[9] see also

[8] Title 42 of the United States Code, § 6926, provides in relevant part: "(b) Authorization of State program

"Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and, after notice and opportunity for public hearing, submit to the Administrator an application, in such form as he shall require, for authorization of such program. . . . Such State is authorized to carry out such program in lieu of the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste (and to enforce permits deemed to have been issued under section 6935 [d] [1] of this title) unless, within ninety days following submission of the application the Administrator notifies such State that such program may not be authorized and, within ninety days following such notice and after opportunity for public hearing, he finds that (1) such State program is not equivalent to the Federal program under this subchapter, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter. . . .

"(d) Effect of State permit

"Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter. . . ."

[9] Title 42 of the United States Code, § 6929, provides: "Retention of State authority

"Upon the effective date of regulations under this subchapter no State or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations, except that if application of a regulation with respect to any matter under this subchapter is postponed or enjoined by the action of any court, no State or political subdivision shall be prohibited from acting with respect to the same aspect of such matter until such time as such regulation takes effect. Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any

Connecticut; Final Authorization of State Hazardous Waste Management Program, 55 Fed. Reg. 51,707 (December 17, 1990) (to be codified at 40 C.F.R. pt. 271) (Noting that EPA reached "final determination that Connecticut's hazardous waste program satisfies all of the requirements and the conditions necessary to qualify for final authorization. Thus, EPA is granting final authorization to Connecticut to operate its program, subject to the authority retained by EPA in accordance with the Hazardous and Solid Waste Amendments of 1984."). The state posits that the legislature intended for the definitions under § 22a-115 to control only those parts of the hazardous waste chapter that do not incorporate the federal act. We conclude that the legislature has not manifested a clear intent to apply the federal definitions, and, accordingly, we agree with the defendant.

The question before us is one of statutory construction. In determining whether federal law or state law governs the meaning of specific terms, we apply plenary review and general principles of statutory construction. *State* v. *Bell*, 283 Conn. 748, 786, 931 A.2d 198 (2007); *State* v. *George*, 280 Conn. 551, 563–64, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). In accordance with General Statutes § 1-2z, we are directed first to examine "the text of the statute itself and its relationship to other statutes. . . ."

"[O]ur ultimate objective in construing statutes is to discern and effectuate the apparent intent of the

requirements, including those for site selection, which are more stringent than those imposed by such regulations. Nothing in this chapter (or in any regulation adopted under this chapter) shall be construed to prohibit any State from requiring that the State be provided with a copy of each manifest used in connection with hazardous waste which is generated within that State or transported to a treatment, storage, or disposal facility within that State."

legislature. E.g., *Cogan* v. *[Chase] Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005); *State* v. *Ledbetter*, 263 Conn. 1, 12, 818 A.2d 1 (2003). Although that objective is the same for both civil and criminal statutes, we have recognized that certain principles of statutory construction bear special relevance to our interpretation of criminal statutes, one of which is the rule of strict construction. Thus, it has long been held that, 'unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state.' . . . *State* v. *Reynolds*, 264 Conn. 1, 69, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). . . . Succinctly stated, '[t]he purpose of the rule of strict construction is . . . to enable the people of the [s]tate to know clearly and precisely what acts the legislature has forbidden under a penalty, that they may govern their conduct accordingly, and to make sure that no act which the legislature did not intend to include will be held by the courts within the penalty of the law.' *State* v. *Faro*, 118 Conn. 267, 274, 171 A. 660 (1934); accord *State* v. *Zazzaro*, 128 Conn. 160, 167, 20 A.2d 737 (1941). 'Strict construction is a means of assuring fairness to persons subject to the law by requiring penal statutes to give clear and unequivocal warning in language that people generally would understand, concerning actions that would expose them to liability for penalties and what the penalties would be.' 3 J. Sutherland, Statutes and Statutory Construction (6th Ed. Singer 2001) § 59:3, p. 142. 'Another reason for strict construction is to protect the individual against arbitrary discretion by officials and judges. . . . A related argument is to the effect that since the power to declare what conduct is subject to penal sanctions is legislative rather than judicial, it would risk judicial usurpation of the legislative function for a court to enforce a penalty

whe[n] the legislature had not clearly and unequivocally prescribed it.' Id., pp. 144–45.

"The requirement that criminal statutes shall be strictly construed is therefore predicated on two fundamental principles. First, the public is entitled to fair notice of what the law forbids. Second, legislatures and not courts are responsible for defining criminal activity." (Citations omitted.) *State* v. *Skakel*, 276 Conn. 633, 674–75, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); accord *State* v. *Kirk R.*, 271 Conn. 499, 510–11, 857 A.2d 908 (2004) ("[C]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." [Internal quotation marks omitted.]).

As directed by § 1-2z, we begin with the text of the statute at issue and then look to related statutes to ensure the coherency of our construction. General Statutes (Rev. to 1999) § 22a-131a (b) provides: "Any person who knowingly transports hazardous waste to a facility which does not have a permit required under the Resource Conservation and Recovery Act of 1976, *or who knowingly treats, stores or disposes of any hazardous wastes without a permit required under said act*, or who knowingly violates any material condition or requirement of such permit, shall be fined not more than fifty thousand dollars for each day of violation or imprisoned not more than two years or both." (Emphasis added.) It is clear that this statute directs persons who intend to store or dispose of hazardous waste to determine whether they would need a permit to do so under the federal act.

Section 22a-131a (b) does not indicate expressly, however, whether the federal act requires permits for *all* treatment, storage and disposal of hazardous waste, or only some activities subsumed within those terms. Nor does the statute expressly incorporate definitions under the federal act for the terms "treats," "stores," "disposes" or "hazardous wastes" as do many of our other statutory schemes. Cf., e.g., General Statutes § 7-454 (expressly incorporating definition under federal law); General Statutes § 8-336 (same); General Statutes § 10-76ff (a) (same); General Statutes § 10-215g (a) (same); General Statutes § 12-214 (a) (2) (same); General Statutes § 13a-95a (same); General Statutes § 16-50i (a) (6) (same); General Statutes § 21a-105 (a) (6) (same); General Statutes § 22a-96 (c) (1) (same); General Statutes § 22a-117 (f) (same); General Statutes § 22a-161 (same). Moreover, because § 22a-131a simply references the requirement of a permit under the federal act, which encompasses a broad statutory and regulatory scheme; see 42 U.S.C. tit. 82; rather than the specific statutes and regulations that delineate permit requirements and applicable definitions, undoubtedly a person seeking to determine whether his conduct is proscribed first might look to see whether state law provides more readily ascertainable information.

Section 22a-115 provides such guidance. Section 22a-115 is the definitional section for chapter 445 of our General Statutes, entitled "Hazardous Waste," which includes General Statutes §§ 22a-114 through 22a-134s. It provides that certain terms, "[a]s used in this chapter," have specified meanings, such as: " '[h]azardous waste,' " " '[d]isposal,' " " '[s]hort-term storage' " and " '[l]ong-term storage.' " Although there is substantial overlap between these definitions and their federal counterparts, they clearly are not identical. Compare footnotes 6 and 7 of this opinion. Notably, the legislature incorporated the federal act's definition of hazardous

waste as one of three components in the state's defini-
tion of hazardous waste; see General Statutes (Rev. to
1999) § 22a-115 (1);[10] but it did not incorporate the fed-
eral definition of disposal or storage. We also observe
that, unlike more than 100 other definitional sections
throughout the General Statutes, § 22a-115 does not
qualify the uniform application of its definitions
throughout the chapter when "context" indicates other-
wise. Reading § 22a-115 as directed, the legislature pre-
sumably intended for the terms "disposal," "storage"
and "hazardous waste," as. defined therein, to apply
without exception or qualification to § 22a-131a.

Although the state correctly points out that the enact-
ment of § 22a-115 predated by one year the addition
of criminal and civil penalties to the hazardous waste
chapter, the legislature never amended § 22a-115 to
exclude § 22a-131a from its application. Indeed, the leg-
islature revisited § 22a-115 on five occasions between
the time of the enactment of § 22a-131a and the opera-
tive revision of the General Statutes for purposes of
this case without so limiting its application.

Looking to the rest of the hazardous waste chapter,
we note the inclusion of other definitional sections,
which are limited in their application to particular sec-
tions within the chapter. See General Statutes §§ 22a-

---

[10] General Statutes (Rev. to 1999) § 22a-115 provides in relevant part: "As used in this chapter:

"(1) 'Hazardous waste' means any waste material which may pose a present or potential hazard to human health or the environment when improperly disposed of, treated, stored, transported, or otherwise managed, including (A) hazardous waste identified in accordance with Section 3001 of the federal Resource Conservation and Recovery Act of 1976 (42 USC 6901 et seq.), (B) hazardous waste identified by regulation by the Department of Environmental Protection, and (C) polychlorinated biphenyls in concentrations greater than fifty parts per million . . .

"(16) 'Federal Resource Conservation and Recovery Act' means the federal Resource Conservation and Recovery Act of 1976 (42 USC 6901 et seq.) and implementing regulations as amended from time to time . . . ."

133a, 22a-133n, 22a-133w and 22a-134. Two of these, §§ 22a-133n and 22a-134, include some of the terms defined in § 22a-115, but prescribe slightly different definitions. Had the legislature included a similar provision to apply to § 22a-131a, defining the pertinent terms consistent with, or by reference to, federal law, such action also would have expressed a clear intent to have the federal definitions control. See *Sullivan* v. *State*, 189 Conn. 550, 556 n.7, 457 A.2d 304 (1983) ("[a]bsent manifest intent to repeal an earlier statute, when general and specific statutes conflict they should be harmoniously construed so the more specific statute controls" [internal quotation marks omitted]). The express directive in § 22a-115 to apply the definitions therein throughout the hazardous waste chapter, in conjunction with the absence of any express or implied limitation in § 22a-131a or elsewhere in the chapter, is persuasive evidence that the legislature did not intend to incorporate the federal definitions into § 22a-131a.

We reject the state's reliance on the legislative history to § 22a-131a as clearly manifesting a contrary intent. The brief discussion therein does not address the application of federal definitions, the incorporation of federal law or any requirement that state law be equivalent to, or no less stringent than, federal law. Rather, there is a brief discussion reflecting an intent to conform the state's penalties to those under the federal act in order to qualify the state's hazardous waste program under federal law.[11] Presumably, based on this objective, the

---

[11] Senator Eugene A. Skowronski presented the following summary of Substitute Senate Bill No. 484, as amended by Amendment A: "[W]hat the [a]mendment does, which will really become the [b]ill, is to make certain changes in our water pollution penalty laws and also create new penalties for violation of our hazardous waste laws . . . all of which are intended to qualify the [s]tate of Connecticut [w]ater [p]ollution [p]rogram and hazardous waste program under [f]ederal law. If these penalties are not enacted, the [f]ederal [g]overnment will pre-empt the [s]tate in the administration of our water pollution and hazardous waste programs. . . . [W]hat the bill does is firstly it provides that anyone who violates any provision of our [s]tate hazardous waste program shall be fined not more than $25,000 for

legislature expressly would have prescribed in § 22a-131a whatever penalties were required under federal law. As a consequence, if a person were to look to the legislative history to confirm what conduct is proscribed under § 22a-131a, *nothing* would direct that person to apply *definitions* under the federal act or to disregard the express directive in § 22a-115 to apply the definitions set forth therein.

Accordingly, viewing §§ 22a-115 and 22a-131a (b) together, as expressly directed, the legislature has imposed criminal penalties when two conditions are met: (1) a person knowingly treats, stores or disposes of hazardous waste, within the meaning of those terms under § 22a-115; and (2) that person did so without a permit required under the federal act. We recognize that, because the meaning of the key terms differ slightly under state and federal law, ostensibly a person could avoid a criminal penalty under state law if he violated federal permit requirements, but he did not engage in conduct proscribed under state law. Similarly, in light of the broader definition of hazardous waste under state law; see footnote 10 of this opinion; ostensibly a person could dispose of what the state deems hazardous waste, but not be subject to criminal penalties because no permit was required for that activity under federal law.

each day of such violation. It further provides criminal penalties for anyone who knowingly violates our [s]tate hazardous waste penalties and both of these provisions are required by the [f]ederal government under [the federal act]. Further . . . the [b]ill makes certain changes in our water pollution laws. . . . All of these changes are necessary, are mandated by federal law, and are necessary for us to adopt in order to have a qualified [s]tate program for water pollution control and hazardous waste control." 24 S. Proc., Pt. 13, 1981 Sess., pp. 4157–58. As we explain later in this opinion, if this case presented an appropriate situation to examine the federal act, federal case law interpreting that act and other federal sources, which it does not, we would be more inclined to read Senator Skowronski's reference to preemption as favoring the state's interpretation. In this regard, we note that § 22a-131a essentially tracks the language of the criminal federal penalty provisions. See 42 U.S.C. § 6928 (d) (1), (2) and (7).

These cases on the margins, however, do not persuade us that the legislature has manifested the clear intent necessary to incorporate the federal definitions into a penal statute when the statutory scheme expressly provides otherwise. Nor do these cases yield a bizarre or unworkable result. See General Statutes § 1-2z. At best, such cases would give rise to an ambiguity, which we must resolve against the state in light of the reasonable interpretation proffered by the defendant. See *State* v. *Lutters*, 270 Conn. 198, 219, 853 A.2d 434 (2004); see also 3 J. Sutherland, supra, § 65A:11, p. 611 ("[t]he significant ambiguity in many environmental statutes only increases the importance of applying the rule of lenity").

Indeed, had the defendant looked to this court's case law for guidance, he would have found a criminal case in which the trial court, and in turn this court, had applied the precise framework stated herein. Under that framework: (1) federal law dictated whether a permit was required; and (2) state law—under the definitions in § 22a-115—dictated whether the defendant had engaged in the proscribed conduct. See *State* v. *Uretek, Inc.*, 207 Conn. 706, 711–12, 543 A.2d 709 (1988).[12]

The state's interpretation is derived by viewing § 22a-131a through the lens of a variety of *federal* sources: provisions of the federal act unrelated to the specific permit requirements, the policy underlying the act as articulated by federal courts and the federal register. If the statute at issue were not penal in nature and presented an appropriate situation in which to take these sources into account, we might be more receptive

[12] Although the state relies on the court's discussion in *Uretek, Inc.*, construing a term in light of Congress' intent, that reliance is misplaced. That discussion related to the construction of a term used in a federal regulation, which was relevant to whether a permit was required. See *State* v. *Uretek, Inc.*, supra, 207 Conn. 719. Undoubtedly, when construing a term under federal law, we look to Congress' intent.

to the state's interpretation. As the state points out, the EPA authorizes a state to operate its own hazardous waste program in lieu of the federal program otherwise operable in that state and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste if the state's program is "equivalent to," and "consistent with," the federal program. 42 U.S.C. § 6926 (b). The EPA has authorized Connecticut to administer its own hazardous waste program. See 55 Fed. Reg., supra, 51,707. The federal act also provides: "Upon the effective date of regulations under [the hazardous waste] subchapter no [s]tate or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations. . . . Nothing in this chapter shall be construed to prohibit any [s]tate or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations. . . ." 42 U.S.C. § 6929. In accordance with this provision, federal courts have concluded that the federal act "sets a floor, not a ceiling, for state regulation of hazardous wastes." *Old Bridge Chemicals, Inc.* v. *Dept. of Environmental Protection,* 965 F.2d 1287, 1296 (3d Cir.), cert. denied, 506 U.S. 1000, 113 S. Ct. 602, 121 L. Ed. 2d 538 (1992); accord *Boyes* v. *Shell Oil Products Co.,* 199 F.3d 1260, 1270 (11th Cir. 2000); *United States* v. *Marine Shale Processors,* 81 F.3d 1361, 1367 (5th Cir. 1996). If this case had arisen in a context in which it would be appropriate for us to look beyond our legislature's expressed intent, we might agree with the state that, reading the legislative history to § 22a-131a in light of the aforementioned considerations; see footnote 11 of this opinion; the legislature intended for the pertinent terms in § 22a-131a to be defined consistently with federal law.

The state appears to overlook the paramount fact, however, that the present case involves the construc-

tion of a penal statute, to which certain fundamental principles apply. First, we are concerned only with *our* legislature's intent, not Congress' intent or the intent of a federal agency. Contrary to the state's suggestion, this is not a case in which issues of preemption bear on resolution of the defendant's claim, a situation in which we necessarily would examine state law in conjunction with federal law. Although we acknowledge the general proposition that the supremacy clause of the federal constitution will require a properly enacted federal law to supersede conflicting state law, the state has provided us with no authority for the novel proposition that the state can use this clause to rectify gaps or inconsistencies the state has created in drafting a penal law.[13] Therefore, whether the EPA authorized our

[13] There are, however, numerous cases in which defendants properly have raised issues of federal preemption as a defense to prosecution under state law. See, e.g., *State* v. *Sebastian*, 243 Conn. 115, 125–55, 701 A.2d 13 (1997) (considering defendant's claim that two federal acts preempted state criminal law), cert. denied, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 756 (1998); *People* v. *Appel*, 51 Cal. App. 4th 495, 505, 59 Cal. Rptr. 2d 216 (1996) (considering defendant's claim that state of California is precluded from prosecuting him because federal law provides for no criminal penalties and preempts California law), review denied, 1997 Cal. LEXIS 861 (1997); *Sabine Consolidated, Inc.* v. *State*, 806 S.W.2d 553, 555–60 (Tex. Crim. App. 1991) (considering plaintiffs' claim that federal Occupational Safety and Health Act of 1970 preempts state of Texas from prosecuting them under state law for criminally negligent homicide). With regard to the state's preemption argument, we note that the state does not contend that giving effect to the state's scheme as written would preclude the EPA from enforcing the criminal penalties under the federal act. See *United States* v. *Elias*, 269 F.3d 1003, 1009–12 (9th Cir. 2001) ("[U]nder [the federal act], the federal government retains both its criminal and its civil enforcement powers. Contrary to the [D]istrict [C]ourt's conclusion, this is true even where a state law counterpart exists, for many of these 'counterparts' provide only misdemeanor punishments where federal law prescribes a felony. We believe [the federal act] only contemplates that the federal permitting scheme is supplanted by authorized state ones. Thus, the federal proscription against transporting hazardous waste without a permit remains, as does the federal penalty for it. What changes, and what is supplanted by state law, is the definition of hazardous waste and the sovereign from whom generators must obtain the necessary permit originally—in this case, Idaho."), cert. denied, 537 U.S. 812, 123 S. Ct. 72, 154 L. Ed. 2d 14 (2002); *United States*

state's program under *the belief* that § 22a-131a incorpo-
rated the federal definitions is irrelevant to the issue
in the present case. There is no language in our *state*
statutes or regulations that manifests a clear intent by
the legislature to incorporate the federal definitions to
the exclusion of those provided in our hazardous waste
chapter. To the extent that the state contends that the
defendant's construction would put at risk the state's
federally conferred authority to administer its program,
the state can remedy that problem through appro-
priate legislation.[14]

Second, constitutional concerns dictate that the legis-
lature's express words must be given effect. It cannot

v. *MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 43–46 (1st Cir. 1991)
(concluding that state authorization does not deprive EPA of its criminal
jurisdiction under federal act).

[14] In 2000, the legislature amended § 22a-131a (b) by changing the reference
to the permit required under the federal act to the "permit required under
subsection (c) of section 22a-449 or any regulation adopted pursuant to said
subsection . . . ." See Public Acts 2000, No. 00-19, § 1 (entitled "An Act
Concerning Criminal Violations of Environmental Laws"). General Statutes
§ 22a-449 (c), which is in chapter 446k, entitled "Water Pollution Control,"
in turn provides: "The commissioner [of environmental protection] may
establish such programs and adopt, in accordance with chapter 54, and
enforce such regulations as he deems necessary to carry out the intent of
sections 22a-133a to 22a-133j, inclusive, sections 22a-448 to 22a-454, inclu-
sive, and Subtitle C of the Resource Conservation and Recovery Act of 1976
(42 USC 6901 et seq.), as amended from time to time, *except that actions
pursuant to the state's hazardous waste program shall be brought under
the provisions of sections 22a-131 and 22a-131a.*" (Emphasis added.) The
commissioner of environmental protection has promulgated a regulation for
the state's hazardous waste permit program that incorporates by reference
various federal regulations, including regulations that define "disposal" and
"storage." See Regs., Conn. State Agencies § 22a-449 (c)-110 (2) (F). We
express no opinion as to whether the 2000 amendment remedies the gap
identified in the present case. We also note that, although we have on
occasion looked to the subsequent history of a statute to determine legisla-
tive intent; see, e.g., *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579,
597, 830 A.2d 164 (2003); *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196
Conn. 529, 541, 494 A.2d 555 (1985); such a practice would be inappropriate
when construing a penal statute wherein the construction proposed by the
state raises concerns of fair notice.

be said that it would provide fair notice of proscribed conduct to state expressly that terms have a specific meaning, but to imply by mere reference to a substantial federal act that regulates the same subject matter that these meanings are irrelevant. It would be entirely reasonable for a person to determine that his conduct does not violate state law—without scrutinizing the federal act—because he first determined that he was not storing or disposing of hazardous waste, as that conduct is defined under § 22a-115.

Should that person nonetheless turn to the federal act to determine whether he would be required to have a permit under *federal* law, he would find nothing in the section of the federal act addressing permit requirements to indicate that it provides definitions for the same terms used in § 22a-131a and defined under state law. The section of the federal act entitled "Permits for treatment, storage or disposal of hazardous waste"; 42 U.S.C. § 6925; does not refer expressly or implicitly to 42 U.S.C. § 6903, the definitional section of the federal act that the state contends controls this case. Indeed, § 6903 is not even situated in the hazardous waste subchapter where the permit requirements are addressed. Moreover, the permit section of the federal act, § 6925, directs the administrator of the EPA to promulgate regulations regarding permit requirements; see generally 40 C.F.R. pts. 260 and 270 (2007); and the administrator has promulgated regulations that define terms applicable to permit requirements. Although those regulations define terms relevant to permit requirements, including "disposal" and "storage," not all of those terms are defined consistently with § 6903. Compare 40 C.F.R. §§ 260.10 and 270.2 (2007) ("[s]torage means the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere") with 42 U.S.C. § 6903 (33) ("[t]he term 'storage', when used in connection with hazardous

waste, means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste").

We therefore conclude that the trial court improperly instructed the jury on the essential elements of the crimes charged by applying the federal definitions. "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment [to the United States constitution] protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . . If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmlessness beyond a reasonable doubt. . . . [A] jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Flowers*, 278 Conn. 533, 543, 898 A.2d 789 (2006); accord *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005) (reciting same standard for review of improper charge on essential element of crime).

The state's brief to this court addresses harmful error only with respect to the count charging disposal of hazardous waste without a permit. It contends that any instructional impropriety as to this count was harmless because there was ample evidence that the defendant

had placed the contaminated sandblast grit directly on the ground. It asserts that this evidence also established "disposal" under the narrower definition in the state statute, requiring that "hazardous waste [enter] the environment . . . ." General Statutes § 22a-115 (3). The record reflects, however, that there was conflicting testimony as to whether the surface on which the sandblast grit had been spread was sandy soil or an asphalt-like substance that completely covered the soil.[15] We disagree with the state that, had the jury been instructed that the state must prove that the hazardous waste *entered* the environment, not that hazardous waste *may* enter the environment, it necessarily would have returned a guilty verdict in light of this evidence. Accordingly, we disagree that the improper instruction on the count of disposal of hazardous waste without a permit was harmless beyond a reasonable doubt. Therefore, the defendant is entitled to a new trial applying the definitions expressly prescribed under state law.

## II

Although our conclusion as to the first issue requires that the defendant receive a new trial, we nonetheless address one of the defendant's other claims that is likely to arise again on remand.[16] See *State* v. *Arroyo*, 284

[15] On the basis of its conclusion that the state did not need to prove under federal law whether hazardous waste actually had entered the environment or likely would have entered the environment, the trial court restricted the defendant's use of this evidence to undermine the credibility of the state's witnesses regarding the physical layout of the work site. Although the defendant does not challenge separately the trial court's ruling on that issue in this appeal, he has asserted in his brief to this court that the trial court's improper ruling that federal law was controlling adversely had affected his ability to present a defense, including the ability to use this evidence for substantive purposes.

[16] We are mindful that it is likely that, on remand, the defendant also will renew his effort to seek admission of groundwater test results to prove that no lead (hazardous waste) had entered the environment, which he claims the trial court improperly excluded. We decline, however, to address this claim. The trial court's ruling was predicated entirely on the lack of relevance of this evidence under the broader federal definition of "disposal" and federal

Conn. 597, 601 n.3, 935 A.2d 975 (2007); *State* v. *Kirby*, 280 Conn. 361, 388, 908 A.2d 506 (2006). The defendant claims that the trial court improperly precluded him from introducing evidence in support of a statutory defense of mistake of law under General Statutes § 53a-6 (b) (2). Specifically, the defendant contends that the court improperly concluded that he could not offer evidence that Paul Cote, the Norwich building inspector, allegedly had told him that it was lawful for the sandblast grit to be contained on site. He asserts that the state building code authorizes building inspectors to require compliance with laws related to building construction or building renovation, which would encompass sandblasting and paint removal. The defendant also points to an appendix to the building code, which cites to the department's regulations, as evidence that § 22a-131a is a law related to those fields within the purview of the building inspector.

The state contends that this evidence properly was excluded for several reasons. First, it asserts that the state building code does not empower a building inspector to enforce, interpret or administer § 22a-131a or any other hazardous waste law because the code does not regulate sandblasting or lead based paint removal. Second, even if the building code did regulate such activities, the state contends that its scope would not extend to the *storage* and *disposal* of hazardous waste. Third,

---

case law construing that definition. The court expressly declined to address the relevance of this evidence under state law in light of its conclusion that the federal definitions controlled. The state does not claim in its brief to this court that the exclusion of this evidence would have been proper under the more restrictive state definition; it claims only that, under the federal definition, the evidence was irrelevant. It is unclear whether the state concedes the relevance of this evidence under state law. In the absence of either briefing on this issue by the parties or prior case law construing the meaning of the pertinent definition under state law, we conclude that the wiser course is to let the parties litigate this issue, should they so choose, on remand.

it contends that Paul Cote lacked authority to issue official interpretations of law related to the building code because General Statutes § 29-252 (c) expressly limits such authority to the state building inspector or his designee, and Paul Cote was not the state building inspector's designee. We conclude that the trial court properly determined that, under the facts of the case, the defendant had not satisfied the requirements of § 53a-6 (b) (2) to assert a mistake of law defense.[17]

It is well settled that "[a] mistake of law . . . even if it is assumed to be honest, is not a valid defense." *State v. Tedesco*, 175 Conn. 279, 288, 397 A.2d 1352 (1978). There are, however, limited exceptions to this rule. Under § 53a-6 (b), a person may be relieved of criminal liability if he engages in the proscribed conduct "under a mistaken belief that it does not, as a matter of law, constitute an offense [and] . . . (2) such mistaken belief is founded upon *an official statement of law* contained in . . . an interpretation of the statute or law relating to the offense, officially made or issued by a public servant, agency or body legally charged or empowered with the responsibility or privilege of administering, enforcing or interpreting such statute or law." (Emphasis added.) Mistake of law is a defense to

---

[17] We note that the defendant does not contend that a mistake of law defense was relevant to negate a state of mind element of § 22a-131a. See General Statutes § 53a-6 (b) ("[a] person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless [1] the law provides that the state of mind established by such mistaken belief constitutes a defense"). Nor does the defendant contend that, even if Paul Cote lacked the requisite authority to issue an official statement of law regarding the disposal or storage of hazardous waste, he nonetheless reasonably relied on Paul Cote's statement under some equitable defense. See 2 P. Robinson, Criminal Law Defenses (1984) § 183 (e), pp. 393–94 and n.27 (discussing reasonable reliance theory of misstatement of law and citing § 53a-6 [b] [2] as example of statute that does not include such reliance as defense). We therefore express no opinion as to the merits of either defense in this case or their availability generally.

culpability, but it is not an affirmative defense. *State* v. *Rouleau*, 204 Conn. 240, 249–50 n.12, 528 A.2d 343 (1987). Therefore, once the defendant adduces evidence to implicate this defense, the state bears the burden of disproving beyond a reasonable doubt that the defendant was operating under a mistake of law. See General Statutes § 53a-12 (a); *State* v. *Rouleau*, supra, 249–50.

This court previously has not construed § 53a-6 (b). The only Appellate Court case to address this subsection sheds little light on its application under the facts of the present case, as it dealt with statements by a law enforcement officer relative to criminal conduct. See *State* v. *Fiocchi*, 17 Conn. App. 326, 331–33, 553 A.2d 181 (concluding that trial court properly denied defendant's request for instruction that "police officer is a public servant and if a statement was made in the course of his employment it is an official statement" because, under circumstances of case, whether statement was "official statement" was question of fact for jury), cert. denied, 210 Conn. 812, 556 A.2d 611 (1989). We also note that, although several other jurisdictions have similar provisions; see Ark. Code Ann. § 5-2-206 (c) (2006); Colo. Rev. Stat. § 18-1-504 (2) (c) (2007); Haw. Rev. Stat. § 702-220 (4) (1993); Ky. Rev. Stat. Ann. § 501.070 (3) (LexisNexis 1999); Me. Rev. Stat. Ann. tit. 17-A, § 36 (4) (2006); N.H. Rev. Stat. Ann. § 626:3 (II) (2007); N.Y. Penal Law § 15.20 (2) (McKinney 2006); N.D. Cent. Code § 12.1-05-09 (1997); there is little case law in those jurisdictions addressing the scope of the official misstatement defense. We need not, however, delineate the parameters of this defense in the present case, as it is abundantly clear that a local building inspector lacks authority to administer, enforce or interpret § 22a-131a.

Section 22a-131a is a penal statute, the contours of which are dictated by the state and federal environmental protection agencies. It addresses a subject matter that is regulated heavily by those agencies—hazardous

waste. A building inspector, however, has no law enforcement powers. A building inspector has no authority to issue a hazardous waste permit required under § 22a-131a (b), nor any authority to waive such permit requirements. A building inspector similarly lacks authority to issue, approve or waive the documentation required under § 22a-131a (a)—applications, manifests, records, etc. Undoubtedly, a building inspector lacks authority to interpret the federal act incorporated by reference into the state environmental protection laws.

A local building inspector is authorized, however, to administer the state building code and to issue building permits upon determining that plans for the construction or alteration of a building or structure conform to the state building code. General Statutes §§ 29-260 and 29-263 (a). Under General Statutes § 29-261 (b), "[t]he building official or assistant building official shall pass upon any question relative to the mode, manner of construction or materials to be used in the erection or alteration of buildings or structures, pursuant to applicable provisions of the [s]tate [b]uilding [c]ode and in accordance with rules and regulations adopted by the [d]epartment of [p]ublic [s]afety. They shall require compliance with the provisions of the [s]tate [b]uilding [c]ode, of all rules lawfully adopted and promulgated thereunder and of laws relating to the construction, alteration, repair, removal, demolition and integral equipment and location, use, accessibility, occupancy and maintenance of buildings and structures, except as may be otherwise provided for." Even if we were to assume, arguendo, that laws relating to sandblasting as a method of alteration, repair or removal would fall within the scope of a building inspector's authority under § 29-261,[18] laws relating to the storage or disposal

---

[18] The building permit for the renovations at the mill did not reference sandblasting, or the storage or disposal of sandblast grit. Paul Cote provided a statement wherein he attested: "The building permit did not address sand-

of hazardous waste generated thereby would not fall within this authority. Indeed, § 29-261 (b) expressly excludes from the building inspector's authority those areas "as may be otherwise provided for."

The defendant nonetheless cites to an appendix to the state building code as evidence that environmental protection laws are "laws relating to the construction, alteration, repair, removal, demolition and integral equipment and location, use, accessibility, occupancy and maintenance of buildings and structures . . . ." General Statutes § 29-261 (b). That appendix provides in relevant part: "The following Appendix of Related Regulations is to provide guidance in ascertaining applicable building design and construction activities regulated by agencies in Connecticut . . . Regulations of the [d]epartment of [p]ublic [s]afety and the [r]egulations of other [s]tate [a]gencies which may or do regulate building design and construction are herein defined. . . ." Conn. State Building Code (1994 Sup.) c. 26, appendix B. The appendix lists nine state agencies, as well as a miscellaneous category. With respect to the department of environmental protection, the appendix lists the following subject matters, which generally correspond to specific chapters within title 22a of the General Statutes: air pollution; soil waste management;

---

blasting. This was not out of the ordinary, because sandblasting is not part of the building code." He also stated therein that, while inspecting some wiring, he had observed a "sand-like substance, covering approximately 100 square feet, located on the ground in the void space. I asked [Lavallee] what it was, and Lavallee identified it as sandblast grit. I did not observe paint chips or anything else which led me to believe that it was contaminated. [Lavallee] then asked me if they could bury it there, and I told him that I did not care, as long as it was 'clean.' When I said clean, I meant that as long as it was just plain sand. When [Lavallee] and I had this conversation, a portion of the concrete floor already had been poured. I never gave permission to [the defendant], Daniel Malchman [the previous owner of the mill property], or [Lavallee] to bury contaminated sandblast grit under the concrete floor . . . ."

water resources; pollution; and water pollution control.[19] The subject matter of hazardous waste is not enumerated in the appendix to the building code, and hazardous waste is addressed in a separate chapter within title 22a, chapter 445.

The defendant's reliance on the appendix is misplaced. As a general matter, we express serious reservations as to whether such a list, which expressly is designated to provide "guidance" and which lists broad subject matters within various agencies' jurisdictions, is intended to vest concurrent authority in the building inspector to administer, interpret or enforce the provisions therein. Indeed, the fact that the state building code, state fire safety code and demolition code are enumerated strongly suggests that the list is intended to provide "guidance" to landowners, builders and contractors, rather than to provide building officials with supplemental authority to that specifically vested by statute and regulation. Even if the appendix was intended to recite "laws relating to" building construction within the meaning of § 29-261 (b), the subject matter of hazardous waste is not listed. Express references to other subject matters cannot under any reasonable construction encompass a subject matter implicitly excluded. Therefore, the trial court properly denied the defendant's request to present a mistake of law defense under § 53a-6 (b) (2).

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

---

[19] We agree with the defendant that the reference to soil waste management may be a misprint as that term does not correspond to any specific chapter of title 22a of the General Statutes. Pertinent chapters could be those governing solid waste management, the Solid Waste Management Services Act or soil conservation. See General Statutes tit. 22a, c. 446d, 446e and 446h. This reference reasonably cannot be construed to refer to the hazardous waste chapter.